FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

11 FEB 16 AM 9:38

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

PENELOPE R. FLETCHER,
FOR PMS, A MINOR
PLAINTIFF
v.

CASE NO. 8:10-CV-2597-T-23EAJ

THE HILLSBOROUGH COUNTY SCHOOL DISTRICT
DEFENDANT

AMENDED COMPLAINT & DEMAND for JURY TRIAL
And FINANCIAL RELIEF REQUESTED

JURISDICTION

1) This is a Federal Jurisdiction Case because it is based on a Federal Question and Federal Law: The Child Abuse Prevention and Treatment Act of 1973 (CAPTA) that was amended by the Keeping Children & Families Safe Act June 25, 2003 and made Public Law No. 108-36. The aim of this Federally-enacted law is to keep all children and their families safe. The Department of Health and Human Services in Washington, D.C. defines "child abuse and neglect" for all states receiving CAPTA funds as meaning, "at a very minimum, any act or failure to act on the part of a parent or caretaker which results in death, or physical or emotional harm, or any act that represents the imminent risk of harm." Because states set their own standards beyond that for what is considered abuse or neglect those few words serve as the only federally-worded definition. Between Oct. 1, 2010 and July 31, 2011, Florida received $1,316,264 in Federal CAPTA funds, which makes it and its agencies (including the Department of Education) responsible to uphold CAPTA standards. The Plaintiff alleges that the acts described in detail in this complaint

fall under the exact definition provided by Federal Law because they have caused both emotional and physical harm to the child PMS.

2) SUPPORT FOR DEFINITIONS USED IN THIS CLAIM

A) FEDERAL LEGAL DEFINITION of "caretaker" by the Federal Agency, Health & Human Services according to (NRS 453A, 080; US Code 5101 et seq 42 USC 5116) is "Any person designated with the primary responsibility of managing the well being of another...." (there is an exception for physicians and other medical personnel.)

B) FURTHER DEFINED BY JUDICIAL DECISION TO INCLUDE TEACHERS

Proof that teachers fall under the terms of this act include a case heard in the 3rd District Court of Appeals in July 2005: The State of Florida v. Vonda Denise Christie (case No. 3 Do.4-1214) rendered the decision that "teachers" (who had before that been only defined according to State Statute 39.01) were actually "caregivers in 'loco parentis' during school hours and activities" and therefore are held to the same standards as a parent in caring for such children and therefore do fall under the rules of Statute 827.01 (for child abuse and neglect claims) the same as parents.

4) ALTHOUGH THIS CLAIM IS FILED UNDER CAPTA, OTHER SUPPORTING LAWS of this complaint include: The No Child Left Behind Act, Public Law 107-110, enacted by the 107th Congress of the United States of America.

Part G of that act, "Miscellaneous and other statutes Section 1075" amends the Child Protection Act of 1993 which states that it applies to "....include any individual who is employed by a school, including teachers and other personnel...."

5) Claims for damages in cases of abuse by school systems are also supported by Federal Law by the following:

A) Subpart 5 Section 2366 of the No Child Left Behind Act, "Limitation on liability by acts of teachers...." Under Portion (1) In General: No. C- "....limitations under this subpart do not apply if the act involves misconduct for which the defendant is found to have violated a Federal or State.... law....and also...."

B) The Supreme Court decision rendered May 14, 1979 in the case of Cannon v. the University of Chicago, 441 US 677, where the Supreme Court overturned an Appeals Court decision and said the plaintiff may maintain the lawsuit filed under Title IX of the Education Amendments of 1972 even though there was no express authority for damages listed in the text of the law. Although that was a sex discrimination case, this case is similar in that a student was specifically targeted and permitted no redress through the proper channels of authority.

C) Franklin v. Gwinnett County Public Schools (503-60 U.S. Supreme Court; decision rendered Feb. 1992 based on Title IV of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, overturning the decision by the U.S. Court of Appeals, 11th Circuit and Justice White saying that "There is an implied right of action under the Civil Rights Act (of 1964) to support a claim for damages......for infringement on Civil Rights...."

3

6) Therefore, this claim is also supported by The Civil Rights Act of 1964 and the terms of the 14th Amendment of the Constitution of the United States of America that guarantees equal protection of every citizen under the law.

## PARTIES

7) Plaintiff: Penelope R. Fletcher -having contacted 7 local and 2 out-of-state law firms since receiving Judge Merryday's ORDER dated Feb 2, 2011 and been rejected due to short deadline for amended complaint; and having been rejected by Bay Area Legal Services as they say they do not handle cases requesting damages, is writing this amended complaint Pro Se. This case is not being filed as a protected class based on any psychological disability of the student, PMS, as the charges would be as serious whether the child is disabled or not; and as school district personnel have directed Ms. Fletcher through an erroneous procedural process for the disabled prior to the filing of this lawsuit, the disability portion of the original complaint has been eliminated and no special consideration under any disability law is asked for or quoted. Penelope R. Fletcher pleads only that the abusive actions of one teacher and three school administrators be heard by a JUDGE OR JURY under CAPTA.

8) DEFENDANT: The Hillsborough County School District on behalf of Eisenhower and Rodgers middle schools; specifically four persons whose behavior will be described in detail in this complaint.

9) CERTIFICATION of Font: 12-Point, Times New Roman in double-spaced type.

GENERAL ALLEGATIONS:

10) Three members of the staff (one teacher and two administrators) at Eisenhower Middle School (referred to hereafter as EMS) and the one employee at Rodgers Middle School were used to specifically target PMS, a minor, for the purpose of keeping her suspended with the goal of expulsion because school personnel did not know how to properly manage a student in Gifted/Honors programs who had an emotional disability. This suit is not based on any disability but on <u>the deliberate physical and emotional abuse, including false</u> charges (some of which were redacted by Tampa school staff when proven without doubt- by the school's own documentation- to be untrue) resulting in the beginning of an escalating juvenile record directed at the child, PMS, by certain staff members; and emotional abuse against PMS's grandparent (who is also the adoptive mother) Penelope R. Fletcher whenever she called staff on the carpet for their actions. The word "disability" is only used here in this one instance to explain the targeting of the child PMS; the "targeting" not being the basis of this suit, but the abuse itself. These same persons also refused to take PMS's bully and sexual harassment reports; and whenever she filed one, she was the one suspended. Although many meetings were held and school district officials from Tampa went to EMS and tried to correct the situation, this emotional and physical abuse continued; was carried over to the new school after this lawsuit was filed and was enforced there until PMS was withdrawn, at which time her emotional state (which had improved each year with the help of teachers and school psychologists from Pre-K through 5th Grade until entry into EMS) was set back several years as can be evidenced by an increased need for therapy and psychiatric treatment and

a juvenile record dating exactly to an incident brought about by school personnel's misconduct. These caused PMS emotional state to become more fragile as her grades went from A's to F's from forced non-attendance and actual physical abuse by a guidance counselor at EMS; and by school personnel refusing her help (and even making fun of her) when she tried to report a boy for sexually harassing her at both EMS and Rodgers elementary schools. After the filing of this lawsuit, although PMS's Honors Class classroom conduct grades remained A's and B's (grades given by her teachers) she was kept suspended by administration and therefore again is failing, causing her emotional instability to regress to a dangerous level. Because of these actions, PMS has lost out on a whole year of education, guaranteed under the Civil Rights Act of 1964 as a basic right of every American child. Plaintiff alleges that the direct targeting and emotional and physical abuse is in direct violation of *Keeping Children & Families Safe.*

ACTS OF THE DEFENDANTS: (Incidents kept in chronological order so the four named school personnel are not separated.) These escalated from minor incidents to calling 9-1-1 and charges being filed against her in juvenile court when actually, a crime was committed against her for which she was defending herself.

11) A boy grabbed PMS (large for 6th Grade) breasts in Nov. 2009. She reported it to guidance counselor Alexandria Miller. No bully report was taken. The boy repeated the action in the hall in Dec. PMS kicked him. PMS was suspended Dec. 14 when a teacher (Murphy) only witnessed PMS kicking but did not see the grab. School policy book on

6

bullying states that PMS original report should have been written up and taken seriously. PMS felt like she had to take matters into her own hands since school did not defend her.

12) Stacy Pedrick, teacher in the Gifted math classroom, took PMS's cell phone and that of another girl during class. Filthy texts were sent back and forth the night before to PMS from (yet a third and fourth) student and she had been showing her phone to a friend Sabrina V. and friend was returning phone after being seated. (Definitely nothing wrong with teacher taking their phones.) But Sabrina V.'s phone was returned to her after class. PMS was told that teacher confiscated both girls' phones; which was not true. PMS learned not to trust this teacher after being lied to.

13) The mother of two girls who had sent text messages saying they "would beat her a—" to PMS the night before took PMS text answer to the school vice principal Ms. Catlin. Ms. Fletcher did not choose to burden the school with such a matter. So PMS was brought to the office and a bully report was written (on the basis of the telephone text written outside the school) on her and she was suspended again, Jan. 14. The other girls were not suspended.

14) Sometime between these suspensions, Ms. Stacy Pedrick overheard PMS talking to her classmate Sabrina V. about being diagnosed bi-polar. During (and in front of the class) Ms Pedrick said "(NAME) if I was bi-polar, I certainly wouldn't brag about it in school."

15) During early January 2010, Ms. Stacy Pedrick refused to allow PMS to get water and/or go to the nurse when choking. PMS has asthma but so far had not been permitted to carry her inhaler and did not have it at the time of the choking incident. PMS left the class anyway, and received in-school suspension.

16) Ms. Fletcher called for a meeting which Tampa supervisors were also asked to attend. At the meeting, it was agreed upon that PMS classroom behavior was not the cause of her suspensions. But that her "hallway and lunchtime interaction" with other students was when problems occurred. This was supposed to be solved by certain "interventions" which were agreed upon by all parties at the meeting. Instead, Alexandria Miller began to escort PMS from one class to another, not allowing her to interact with other students. The problem was that there were to be no restroom or water fountain stops between classes. Once in the classroom, when she would ask to go, teachers would say she should have done that between classes. After three days of whole days without bathroom or water privileges PMS was wetting her pants in Ms Pedrick's room, and was refused a hall pass. On Jan. 22, 2010, she called teacher "a bitch" and was suspended for getting up and leaving class anyway; in humiliation, she ran (wetting) from the room and called the teacher a "bitch" for which she was suspended. At this point, Ms. Fletcher accused Ms Miller of child abuse verbally in the main lobby of the school and called Tampa supervisors again.

17) Still, PMS got in-school suspension for an action in Ms. Stacy Pedrick's class for which other classmates did not. Calling out of turn Feb. 12. By now, she had missed

more than half the lessons in the Gifted class and Ms. Fletcher was told she could lose her Gifted status. Ms. Fletcher called a meeting with guidance counselor Ms. Freedland-Barone and vice principal Faber and they agreed to move her to another math teacher. Time went by. PMS first stated that she was being sent out of the room on errands when assignments were given out. Then she began getting homework other students did not get. She began bringing home college-level math; 10-12 pages a night, homework other students did not get. At first, Ms. Fletcher called adults to help explain and complete the homework. Two college students, and a grown granddaughter of Ms Fletchers. After about two weeks, when all her other grades were falling because she had no time to do other assignments, PMS aunt went to the math teacher and asked why PMS was receiving homework other students were not. She answered "because she deserves it." Ms. Fletcher called supervisors in Tampa and PMS was moved to another math class and kept her Gifted status.

18) PMS was written up for "punching another student in the face" almost immediately after that meeting. According to PMS, this was a push-shove in the hallway in front of Ms Pedrick's classroom and other student was not referred to the office. Then Feb 24, PMS was referred to the office for "threats and intimidation" after not being allowed to file a bully report (per Ms. Alexandria Miller, guidance) when a boy again grabbed her breasts. She said "I'm going to kill you" in the hallway to the boy and was overheard by another teacher (Grady) who did not know the history. Following this, this boy punched PMS every single day in the hall (with same student witness) for more than two weeks and was never written up; and PMS no longer tried to make bully reports. By now, Ms.

Fletcher was contacting Tampa supervisors regularly, and one, Mr. Ron Smiley, had gone to the school and spoken to several of the people Ms. Fletcher had complained about. Once, he called Ms. Fletcher from the school and asked her what she wanted done. Present to that conversation and what was supposed to happen was Mr. Robinson, VP and supposedly disciplinarian, who assured Ms. Fletcher the matters would be corrected. She was now being barred from any "fun" activities; including Fun Fridays and even having lunch with her peers. One day, she entered her science classroom and found her desk pushed to the back of the room and turned backwards. Ms. Fletcher continued to complain, call Tampa supervisors, and the incidents in school escalated to calling police and having "chargeable" incidents written up.

19) PMS was suspended from EMS March 9, 2010 for supposedly stabbing a student with a pencil. This was written up as a Level 1 offense; equal to knife stabbing; gunshot, etc. However, in June of that year, during a meeting with school personnel and Tampa staff, Ms. Fletcher was given PMS cum (main office) file to examine during a break by one of Tampa ESE staff who even offered to copy it for her. When everyone left the room for the break, Ms. Fletcher noticed that a paper had been pulled halfway out of the file jacket and looked at it. Actually, it was 2 papers, paper-clipped together. One was a written report signed by the school nurse (could not read name) that says "no stab marks were indicated and "no stabbing occurred." To that was another paper clipped (with a big smiley face drawn on the page) "Please shred this immediately." PMS had never stabbed anyone; she had thrown a pencil at someone. Staff knew she had not, and had filed the report anyway.

20) Ms. Fletcher has at least 300 pages of emails and correspondence between herself and school personnel dated from Jan. 2010 to April 1, 2010, at which time Ms Fletcher sought the help of Federation of Families director Larry English and education specialist Suzanne Swearington. This is a group that helps parents advocate in the school system setting. A meeting was called and discussions took place about what was to happen. Things did not go according to plan. Even attending Saturday school did not make up for all the time she had lost in her math class with Ms. Pedrick and she passed with a D after having been an all A student with perfect (or near-perfect attendance) from Pre-K until that time.

21) May 14 a substitute teacher was teaching PE class, which was PMS's last period of the day before going to her bus. PMS saw a girl, Cherish S. going through her school bag off to the side of the room. The 6th graders did not have lockers; a fact the school resource deputy there, Deputy Qunitana, told Ms Fletcher was a cause of many thefts during that year. PMS had a $209 camera in her bag because she had gone with her grandmother the night before and taken photographs for one of the local the newspapers for which Ms. Fletcher freelances. PMS, a promising photographer, had several photo credits and was paid by Ms Fletcher for going to photo shoots occasionally with her as training. PMS went to the sub and asked that she be permitted to look in her bag immediately. He told her to sit down, which she did. The bell rang. The camera was missing. PMS asked the sub to please "lock down" the PE area. The regular PE teacher had done that many times; the week prior to that when someone's MP3 player had gone missing during class. The

11

sub refused, saying "go on to your bus or you will be late." On the way to the bus, PMS friend Sabrina V. was standing with Cherish S. holding Cherish S's school bag. Sabrina V called to PMS and said "she has your camera." Cherish S hit Sabrina V. PMS ran to defend her friend, who is much smaller than Cherish S. Sabrina V told PMS that Cherish S had also called her a "Nig---". Mr. Robinson saw PMS pulling the bag from Cherish. Cherish was allowed to board the bus, with the camera in her bag. Only PMS was sent to the office, and despite the fact that a school resource officer was present 9-1-1- was called. Ms. Fletcher met with the officer in the principal's office and took PMS home in her car. Nothing was said about charges. Shortly after this, Ms Fletcher was told by Officer J Devoe, who was a school resource officer for 7 years, that when a resource officer is present 9-1-1 is not to be called unless there is a present danger to life or severe physical harm. "That's why they have the resource officers," Devoe said. Yet two weeks later, Ms. Fletcher was served with a "battery" report with the complainants listed as the parents of Cherish S. The charge was "battery" for which a juvenile record was begun and 20 hours of community service performed. Cherish S.'s parents wanted nothing to do with this and did not even show up at the court date. This, however, was not the end of the school's filing court charges against PMS, who by now, was back in weekly therapy and mistrusted all adults, including her grandmother, who she now said "could obviously not protect her."

22) A meeting to decide what was to be done about the following school year was scheduled, with EMS personnel, a teacher from Progress Village Magnet School, and Tampa supervisors May 26, 2010 at EMS; just before exams. PMS was suspended at the time for the battery but was due to go back the next Monday for exams. As Ms. Fletcher

was entering the room, she got a text that her grown daughter had been the victim of a crime and was having brain surgery that day in Jackson, Tenn. She was standing next to Ms. Estelle Wolfman, a Tampa supervisor, and handed Ms Wolfman the phone. Ms. Wolfman told the others around the table the meeting would have to be postponed; even drove Ms. Fletcher home in her car because Ms Fletcher was in no condition to drive, and had Ms. Catlin follow them in her car to drive her back to the school. Ms. Fletcher was assured that PMS could return to the school for exams and the meeting would be rescheduled before school started in August. While Ms. Fletcher was in Tenn. at her daughter's bedside the next Monday, a 25-year-old granddaughter was in charge of PMS in Ruskin. She dropped PMS off at EMS on her way to work. The school immediately upon seeing PMS on school grounds called 9-1-1 to have her escorted to Juvenile Detention. Had PMS not had her cell phone and reached her cousin's husband to come and get her, she would have been locked up for "trespassing" for going to school to take her exams. The school told Ms Fletcher later when called on the phone that because Ms Fletcher had not had a meeting with school staff, PMS could not return to the school grounds after suspension. That was not what Ms Fletcher was assured the day she left the meeting after receiving the text about her grown daughter's surgery.

23) Ms. Fletcher enrolled PMS in Rodgers Middle School for the 2010/2011 school year, having to drive her as this school is out of her home district. After several weeks when all was going well, Ms Fletcher went to parent's night and met all PMS's teachers. They all said they enjoyed having her in their classes, and continued to receive A's and B's in

classroom conduct in their Honors classes. However, after Ms. Fletcher filed this lawsuit in November 2010 suspensions began at Rodgers as well.

24) The first suspension came the day Ms Fletcher had attended a meeting with school mediator Mr. Hertzberg, Nov. 18, 2011 and afterward filed this lawsuit. This suspension was because of an out-of-school matter that school personnel had heard about and spoken with a parent about PMS. The parent, who is landlord of several properties near Ms. Fletcher's home, had dropped her daughter, Danielle G. at Ms. Fletcher's house without permission while Ms Fletcher was at work and PMS had another friend over. A 3-way fight ensued, the parent was told by Ms Fletcher that PMS was on probation (from the Cherish S. event at EMS) and please not to allow her daughter back at their home, which riled the parent up and she filed a battery charge which she knew would appear as a VOP as well as a new charge because of what she had been told. She was angry that she no longer had a place to drop her daughter while she worked on houses in the area. This had nothing to do with the school and PMS should never have been suspended over it.

25) Then, in December 2010, PMS reported being inappropriately touched by a boy and talked to about sex to school vice principal Ms. Butler and said she wanted to report it as sexual harassment on a bully report. Deputy Wayans, the school resource officer, was also present and asked PMS (jokingly in front of Ms Butler) "if the boy had held a gun to her head" and said if he had not, it wasn't sexual harassment and to get out of the office and go on to class. PMS took the matter into her own hands and was suspended later that day for "inappropriate conduct" when she hit the boy.

FACTS IMPORTANT TO THE CASE:

26) At the July 27, 2011 school board meeting, Meeting No. 20100727_416, section A, Item 7.02 stated that Eisenhower Middle School had the highest number of expulsions in Hillsborough County. There were only three schools that even reached into the twenties; EMS had 25 expulsions during the previous school year.

27) The Florida Supreme Court judged Hillsborough County to be a "retaliatory school district" in the case of Whitehead v. The Hillsborough County School District (1999/2000) in that when parents made reports and tried to force better treatment, staff- under the direction of school administrative staff- retaliated at both child and parents.

28) CONCLUSION:

Penelope R. Fletcher, as the guardian and parent of PMS, a minor, prays the court to make judgment as follows:

29) To award damages to pay for the following based on the current price of therapy being received by PMS and an averaging of two private schools, including costs to and from the schools:

A) Weekly therapy at $120= (52 X $120)= $6.240 a year until age 22 Total $62,400

B) Medication and doctors' appointments (same time period) psychiatrist twice monthly @ $80 (26 X 10 @ $80) = $41,000

C) Gas, approximately $30 a week for medical appointments (same time frame) 30 X 52 X 10 = $15,600

D) Private School approximately $6,000 a year based on Providence Christian School and St. Stephens Catholic School averaged together. Grade 8 only, $6,000

E) Grades 9-12 averaged between Tampa Catholic and Academy of Holy Names approximately $9,000 a year X 4 years = $36,000 for tuition and $3,000 (conservatively) for books and uniforms

F) Court, legal advice, gas, misc., already spent $5,000

G) Time from work (already taken) approximately 4 hours per week for the last 2 years ( 1 and ½ school years) at average of 4 weeks per month @ $50 an hour = approximately $9,000

H) Transportation to and from private school (because of where plaintiff lives there is no private school close to her) about $50 per week, very conservatively, based on 4 weeks per month, 9 month school year for 10 years = $18,000

I) Tutoring for the rest of this school year (3 months at approx. $60 per week) = 12 weeks X $50 = $600

J) Total for schooling, medical and transportation related to this case: $196,600

H) Psychological damage to child $250,000

I) Damages to emotional and physical health of grandmother/guardian (Biological grandmother is parent by adoption) $250,000

Total Damages= $696,600

16

30) Therefore, based on No. 29 (A-I) Plaintiff Penelope R. Fletcher, pleading the court for PMS, a minor, asks that an award of $696,600 and any other relief as the Court shall find to be fair and proper to be adjudged in the favor of plaintiff by the Hillsborough County School District without delay.

Respectfully Submitted February 16, 2011

By *Penelope R. Fletcher*

Penelope R. Fletcher
13352 Laraway Drive
Riverview, FL 33579-7101
(813) 240-1582

*Plaintiff Pro Se*

### Certificate of Service

I HEREBY CERTIFY that on this day 16 day of February, 2011, a true and correct copy of this Amended Complaint was mailed in its entirety, postage prepaid, Certified Mail to both counsel and co-counsel listed below; having received the Waiver of Summons for this case Dec. 12, 2010.

Certified Mail Sent to:

Thomas M. Gonzalez
Thompson, Sizemore, Gonzalez & Hearing
201 N. Franklin St., Suite 1600
Tampa, FL., 33602
And to co-counsel:

Jennifer Watson
Thompson, Sizemore, Gonzalez & Hearing
201 Franklin St., Suite 1600
Tampa, FL., 33602

17